UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KELLY AUSTIN,<br><br>           Plaintiff,<br><br>-against-<br><br>PHONE2ACTION, INC.,<br><br>           Defendant. | Case No: 21 Civ. 491<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kelly Austin ("Plaintiff" or "Austin") by and through her undersigned counsel alleges as follows:

1. This is action under Title VII of the Civil Rights Act of 1964, Section 296 of the New York Executive Law, and Section 8-107 of the New York City Administrative Code.

2. Austin brings this action against her former employer, Phone2Action, Inc. ("P2A"), a company with a long history of discrimination against its female employees. Despite paying lip service to cultivating a diverse and non-discriminatory corporate culture, P2A has regularly indulged men who belittle, denigrate, and discriminate against their female subordinates and co-workers. Over the years P2A has developed a reputation for compensating women employees less than male employees, refusing to promote women to roles of responsibility and authority, punishing women who complain, and even forcing select women out of the organization entirely.

3. As a result, women have quit or been expelled from P2A in droves. Despite being a small company with a limited headcount, on at least one occasion, four women have left the company on the same day. Indeed, the only female member of P2A's management team – the

co-founder and former CEO – stepped down in the beginning of 2020 and has since cut all ties with the company she founded.

4. When Austin complained in July 2020 about unequal treatment from her supervisor, she hoped that P2A's human resources department would properly investigate the issue and work toward a fair and lawful resolution. Instead, she was summoned to a meeting with Faisal Siddiqui, P2A's Chief Technology Officer. After HR brushed off Austin's complaints without any meaningful investigation, Mr. Siddiqui, who has had numerous past complaints about his misogynistic behavior, informed Austin that, having complained about gender discrimination, she was "no longer a good fit" for the company.

5. When Austin objected to this illegal termination, P2A escalated its retaliation, reversing her last direct deposit transaction and withdrawing funds from her personal bank account without authorization or legal authority. P2A only backed down from its theft of Austin's paycheck when threatened with subsequent legal action.

6. P2A has since fired Siddiqui for his long pattern of discriminatory behavior. But P2A's culture of misogyny and discrimination endures. Indeed, just a few weeks ago, the company actively shut down its "Employee Voices" Slack channel, for fear that it could be used to document ongoing discriminatory behavior within the business. And P2A refuses to be held accountable for the past illegal conduct perpetrated by Siddiqui and others like him.

7. Having exhausted all other avenues to resolve this matter, Austin now brings this claim to vindicate her rights and hold P2A accountable for its illegal behavior.

## PARTIES

8. Plaintiff Kelly Austin ("Austin") is a former employee of P2A who resides in Brooklyn, New York.

9. Defendant Phone2Action, Inc. ("P2A") is a company organized under the laws of Delaware with its principal place of business in Arlington, Virginia.

## JURISDICTION AND VENUE

10. The Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332(a)(1), as it involves claims arising under a federal statute, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

11. The Court has supplemental jurisdiction over the claims arising from state law pursuant to 28 U.S.C. § 1367.

12. In addition, this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that (a) Plaintiff is a resident of New York and Defendant is a resident of Virginia, and (b) the matter in controversy exceeds $75,000, exclusive of interest and costs.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because a substantial part of the events underlying this action occurred in this District.

14. Plaintiff has standing to bring this suit as she duly filed her administrative charge before the EEOC and received her Notice of Right to Sue on January 15, 2021.  *See* Exhibit A.

## FACTUAL ALLEGATIONS

**Austin's Employment with P2A**

15. Defendant Phone2Action ("P2A") is a software company based in Arlington, Virginia.

16. P2A makes "digital advocacy" software designed to enable businesses and special interest organizations to marshal potential political supporters and deploy them in an organized and coordinated fashion to influence elected officials.  In its marketing materials, P2A boasts of

its ability to enable its clients, including lobbying firms and Fortune 500 companies, to create the appearance of "grass roots" support by arranging "telephone calls" to legislators, "public comments on regulatory agency sites during public comments periods," and semi-automated comments delivered through email, Twitter, or Facebook.

17. Ms. Austin is a highly trained software engineer with many years of experience in Quality Assurance ("QA") and technical automation at companies in the Washington DC region.

18. Austin was hired by P2A as a QA engineer in November of 2018. Shortly after she was hired, the only two other QA staffers left, and Ms. Austin took charge as the sole QA employee at P2A. After several additional employees came on board, Ms. Austin assumed a supervisory role over QA operations, training the newly hired QA apprentices how to properly automate tasks and perform the necessary job responsibilities to support P2A. As the most senior QA employee Ms. Austin served as the de-facto head of the QA department for over a year. When P2A needed to develop a framework to evaluate QA employees, Ms. Austin provided the information concerning tasks and metrics necessary to conduct reviews.

19. The company repeatedly recognized Ms. Austin's extraordinary performance. In October of 2019, P2A paid for her to attend a conference on the use of Selenium automation framework. As recently as December of 2019, Ms. Austin was selected to attend specialized leadership training paid for by P2A and conducted by an outside consultant. In January of 2020, when Ms. Austin received an offer to join another company run by a former colleague, P2A made her a counteroffer, increasing her annual salary from $77,000 to $94,500 and awarding her stock options in the company.

20. Ms. Austin has never received a negative performance review, and her most recent 360 review, conducted in May of 2020, was uniformly positive. Indeed, her manager

specifically complimented her over and over again during their meeting stating that the entire "QA team speaks highly of you and goes to you as a resource" and telling Ms. Austin that she was a "really strong manual tester with a strong focus on best practices."

**P2A Discriminates Against Its Female Employees**

21. Over time, P2A has developed major gender equity problems that have only worsened since its acquisition by Frontier Growth in June of 2019. It has a history of paying its female employees substantially less than their male counterparts, failing to promote women to positions of responsibility within in the company, and suppressing female voices and input into company decisions.

22. Because of this, P2A has a reputation among female tech workers for its "culture of fear." Former employees describe P2A as a firm where "female employees were held to a higher standard than their male peers." Other former employees claim that acts of sexual harassment went ignored by management, leading employees to stop reporting them. As one person put it, "[i]t's a toxic culture and many diverse people are leaving."

23. As a result of this inequitable treatment, on December 19, 2019 four women, including three women of color, left the company on the same day. Indeed, the only female member of P2A's management team – the co-founder and former CEO – stepped down in the beginning of 2020. She has since severed all ties with the company.

24. In addition to suppressing and eliminating female talent, the company has actively promoted supervisors and executives with a history of bias against women. In the fall of 2019, Austin's original supervisor, the VP of Engineering, left the company and was replaced by Matt Morganante, the Engineering Director. Mr. Morganante wasted no time in telling Austin that he did not believe that QA required internal leadership like her (that is to say, a woman) and

5

attempted to have her invitation to leadership training rescinded. It was only with the intercession of P2A's then-Chief Executive Officer Ximena Hartsock that Austin was permitted to attend the training.

25. Since Ms. Hartsock left management in 2020, P2A's all-male management team has stepped up its harassment of the remaining female employees. The company brought on Faisal Siddiqui as the new Chief Technology Officer, an individual who has had numerous complaints brought against him for improper workplace behavior.

26. Indeed, in the summer of 2020, Mr. Siddiqui dismissed a female colleague's remarks on a company-wide call as sounding "like my mother" – and claimed that he could not even listen to her female hectoring. When forced to issue an apology for this behavior, he admitted that it was not an isolated incident, stating bluntly "I've done things in my life that I'm not very proud of." While Mr. Siddiqui was subsequently assigned to attend training, his bias against female employees and women in management roles remained outspoken, flagrant and unlikely to be easily corrected.

**Austin Complained About Unequal Treatment to Human Resources**

27. After being overridden by Hartsock in late 2019, Mr. Morganante continued his campaign against Austin.

28. On July 28, 2020, Mr. Morganante sent Austin an email, copying Mr. Siddiqui, in which he blamed Austin for two bugs that were caught late in the QA process. Neither bug was pushed to production code and as a consequence neither made its way into the finished product. Nevertheless, Mr. Morganante chastised Austin for allegedly failing to write a test case for one of the bugs and failing to respond to the other until three weeks after a ticket had been generated.

29. Mr. Morganante's accusations were counterfactual and – frankly – bizarre, and his decision to copy Mr. Siddiqui suggested that he was attempting to create a false record of poor performance. Faced with this, Austin wrote a substantial response to his message on July 29, 2020, copying Shelli Holland, P2A's head of human resources. Austin pointed out that the P2A corporate policy was not to write new test cases for bug fixes or improvements unless there were functional changes to the existing steps to test for a particular feature. And while the ticket Mr. Morganante pointed out did exist for three weeks, the bug itself was introduced by a "hotfix" added just a few days prior to Austin addressing it.

30. Approximately two weeks later, Austin followed up with Ms. Holland, asking if HR intended to investigate or take any action based upon the exchange. Austin explained the pretextual nature of Ms. Morganante's complaints. Austin also made clear that, even if Mr. Morganante's complaints had been meritorious, that numerous male QA employees, including Chris Franklin and Peter Pvartz, had made significantly worse errors and had not been called out for criticism in front of the CTO in the same fashion. Indeed, Mr. Franklin and Mr. Pvartz had failed to detect bugs that were pushed into production code, potentially harming the integrity of the P2A product.

31. In the course of her conversations with Ms. Holland, Austin made clear to her that she was being treated differently – and substantially worse – than her male colleagues. Ms. Holland told Austin that she would need to speak with Mr. Morganante or Mr. Siddiqui to investigate what she acknowledged to be an "unequal treatment claim."

**Austin Was Immediately Fired for Complaining About Unequal Treatment**

32. The following week, on Tuesday August 18, 2020, Ms. Holland told Austin that she'd spoken to Mr. Siddiqui and that she was going to set up a meeting to discuss the matter.

7

That meeting took place, via Zoom videoconferencing at 9:00 AM on Wednesday August 19, 2020.

33. Ms. Holland opened the meeting by saying that she'd investigated Austin's complaints of unequal treatment because of gender and found them to not be justified. She then turned over the meeting to Mr. Siddiqui, who indicated that, in light of Austin's complaints, that she was no longer a good fit at the company and was fired, effective immediately. Austin's access to corporate email and documents was blocked before the meeting even concluded.

34. Mr. Siddiqui stated that his decision was final and that there was no point in even discussing it. He then shut off his video, telling Ms. Holland to inform Austin about two potential severance packages, each of which would require Austin surrendering any right to file a claim of gender discrimination against the company.

**P2A Continues to Retaliate Even After Austin is Terminated**

35. Austin hired counsel, and on August 28, 2020 sent P2A a letter objecting to this retaliatory discharge.

36. In response to this letter, P2A reversed Austin's final direct deposit transaction and withdrew – without Austin's consent or knowledge – already paid wages from Austin's bank account.

37. This action was tantamount to theft, as Austin was unambiguously entitled to this money and P2A had no right to take it. Only after Austin's attorney threatened further legal action did P2A send Austin a check for the stolen funds.

38. On September 25, 2020, Austin filed a charge of discrimination with the EEOC, alleging that she had been illegally discriminated against because of her gender and then terminated when she complained about the discriminatory conduct.

39. In mid-November of 2020, P2A fired Mr. Siddiqui.

40. On information and belief, Mr. Siddiqui was fired because numerous other female employees complained of his discriminatory behavior and at least one key engineer claimed that she would leave the company if he were not finally removed.

41. On December 31, 2020, P2A's co-founder and former CEO, Ximena Hartsock, formally severed ties with the company. Ms. Hartsock had previously stepped down from any operational role at P2A, but the company's continued discriminatory practices had made any ongoing relationship untenable.

42. In early January of 2021, P2A shut down its internal "Employee Voices" Slack channel, in an effort to prevent evidence of its discriminatory practices from being created on its internal messaging system.

43. On January 15, 2021, the EEOC, concluding that it was unlikely to finish its investigation in 180 days, issued Austin her Notice of Right to Sue. A copy of that notice is attached hereto as Exhibit A.

## CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### GENDER DISCRIMINATION
### 42 U.S.C. § 2000e, *et seq.*

44. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

45. Defendant has discriminated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991, by reprimanding and terminating Plaintiff because of her gender, and permitting, enabling, and encouraging its agents to engage in such behavior.

46. Defendant has engaged in, *inter alia*, the following unlawful and/or discriminatory conduct:

- Stripping Plaintiff of supervisory responsibilities on the grounds that her team did not lead female leaders;

- Denying Plaintiff opportunities for development, promotion, and advancement, offered to similarly situated men;

- Reprimanding Plaintiff for pretextual errors in an effort to create a record by which she could be removed in an effort to reduce female headcount;

- Reprimanding Plaintiff for alleged mistakes more harshly than other similarly situated men;

- Terminating Plaintiff.

47. Upon information and belief, other female employees were also discriminated against.

48. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

49. As a result of Defendant's conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost employment opportunities, other financial loss, and non-economic damages.

50. By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII, including an award of punitive damages.

51. Attorney's fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT TWO
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
## RETALIATION
## 42 U.S.C. § 2000e, *et seq.*

52. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

53. On July 29, 2020 and in subsequent conversations in early August of 2020, Plaintiff complained to Shelli Holland, P2A's head of human resources, that she was being discriminated against because of her gender.

54. On August 18, 2020, Ms. Holland told Austin that she'd spoken to Mr. Siddiqui about these complaints and that she was going to set up a meeting to discuss the matter. That meeting took place, via Zoom videoconferencing at 9:00 AM on Wednesday August 19, 2020.

55. Ms. Holland opened the meeting by saying that she'd investigated Austin's complaints of unequal treatment because of gender and found them to not be justified. She then turned over the meeting to Mr. Siddiqui, who informed Austin that she was being immediately terminated because of her complaints.

56. On August 28, 2020 Austin, through counsel, sent P2A a letter complaining about this retaliatory discharge.

57. In response to this letter, P2A reversed Austin's final direct deposit transaction and withdrew – without Austin's consent or knowledge – already paid wages from Austin's bank account.

58. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

59. As a result of Defendant's conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost employment opportunities, other financial loss, and non-economic damages.

60. By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII, including an award of punitive damages.

61. Attorney's fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT THREE
### VIOLATION OF NEW YORK EXECUTIVE LAW § 296, subd. 1(a)
### GENDER DISCRIMINATION

62. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

63. Defendant has discriminated against Plaintiff in violation of Section 296, subdivision 1(a), of the New York Executive law by reprimanding and terminating Plaintiff because of her gender, and permitting, enabling, and encouraging its agents to engage in such behavior.

64. Defendant has engaged in, *inter alia*, the following unlawful and/or discriminatory conduct:

- Stripping Plaintiff of supervisory responsibilities on the grounds that her team did not lead female leaders;

- Denying Plaintiff opportunities for development, promotion, and advancement, offered to similarly situated men;

- Reprimanding Plaintiff for pretextual errors in an effort to create a record by which she could be removed in an effort to reduce female headcount;

- Reprimanding Plaintiff for alleged mistakes more harshly than other similarly situated men;

- Terminating Plaintiff.

65. Upon information and belief, other female employees were also discriminated against.

66. As a result of Defendant's conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost employment opportunities, other financial loss, and non-economic damages.

67. By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the New York Executive Law.

**COUNT FOUR**
**VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107, subd. 1(a)**
**GENDER DISCRIMINATION**

68. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

69. Defendant has discriminated against Plaintiff in violation of Section 8-107, subdivision 1(a), of the New York City Administrative Law by reprimanding and terminating Plaintiff because of her gender, and permitting, enabling, and encouraging its agents to engage in such behavior.

70. Defendant has engaged in, *inter alia*, the following unlawful and/or discriminatory conduct:

- Stripping Plaintiff of supervisory responsibilities on the grounds that her team did not lead female leaders;

- Denying Plaintiff opportunities for development, promotion, and advancement, offered to similarly situated men;

- Reprimanding Plaintiff for pretextual errors in an effort to create a record by which she could be removed in an effort to reduce female headcount;

- Reprimanding Plaintiff for alleged mistakes more harshly than other similarly situated men;

- Terminating Plaintiff.

71. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

72. As a result of Defendant's conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost employment opportunities, other financial loss, and non-economic damages.

73. By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Administrative Code, including an award of punitive damages.

## COUNT FIVE
## VIOLATION OF NEW YORK EXECUTIVE LAW § 296
## RETALIATION

74. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

75. On July 29, 2020 and in subsequent conversations in early August of 2020, Plaintiff complained to Shelli Holland, P2A's head of human resources that she was being discriminated against because of her gender.

76. On August 18, 2020, Ms. Holland told Austin that she'd spoken to Mr. Siddiqui about these complaints and that she was going to set up a meeting to discuss the matter. That meeting took place, via Zoom videoconferencing at 9:00 AM on Wednesday August 19, 2020.

77. Ms. Holland opened the meeting by saying that she'd investigated Austin's complaints of unequal treatment because of gender and found them to not be justified. She then turned over the meeting to Mr. Siddiqui, who informed Austin that she was being immediately terminated because of her complaints.

78. On August 28, 2020 Austin, through counsel, sent P2A a letter complaining about this retaliatory discharge.

79. In response to this letter, P2A reversed Austin's final direct deposit transaction and withdrew – without Austin's consent or knowledge – already paid wages from Austin's bank account.

80. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

81. As a result of Defendant's conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost employment opportunities, other financial loss, and non-economic damages.

82. By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available under the New York Executive law.

## COUNT SIX
### VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107, subd. 7
### RETALIATION

83. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

84. On July 29, 2020 and in subsequent conversations in early August of 2020, Plaintiff complained to Shelli Holland, P2A's head of human resources that she was being discriminated against because of her gender.

85. On August 18, 2020, Ms. Holland told Austin that she'd spoken to Mr. Siddiqui about these complaints and that she was going to set up a meeting to discuss the matter.  That meeting took place, via Zoom videoconferencing at 9:00 AM on Wednesday August 19, 2020.

86. Ms. Holland opened the meeting by saying that she'd investigated Austin's complaints of unequal treatment because of gender and found them to not be justified.  She then turned over the meeting to Mr. Siddiqui, who informed Austin that she was being immediately terminated because of her complaints.

87. On August 28, 2020 Austin, through counsel, sent P2A a letter complaining about this retaliatory discharge.

88. In response to this letter, P2A reversed Austin's final direct deposit transaction and withdrew – without Austin's consent or knowledge – already paid wages from Austin's bank account.

89. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

90. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

91. As a result of Defendant's conduct alleged in this complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, lost employment opportunities, other financial loss, and non-economic damages.

92. By reason of Defendant's discrimination, Plaintiff is entitled to all remedies available under the New York City Administrative Code, including an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE the Plaintiff prays that this Court:

A. Award nominal, compensatory, and punitive damages to Plaintiff in an amount to be determined at trial;

B. Award litigation costs and expenses to Plaintiff, including, but not limited to, reasonable attorneys' fees;

C. Award back pay, front pay, lost benefits, preferential right to jobs, and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Plaintiff.

D. Order Defendant to make whole Plaintiff by providing her with appropriate lost earnings and benefits and other affirmative relief; and

E. Award any additional and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable of right by Jury.

**DATED:** New York, New York
January 29, 2021

By: /s/ Robert Glunt
Robert Glunt

MANDEL BHANDARI LLP
Robert Glunt
80 Pine Street, 33rd Floor
New York, NY 10005
T: (212) 269-5600
F: (646) 964-6667
glunt@mandelbhandari.com

*Attorneys for Plaintiff Kelly Austin*